Texas Drivurself System, Inc. v. Commissioner.
Texas Drivurself Sys. v. Commissioner
Docket No. 112159.
United States Tax Court
1944 Tax Ct. Memo LEXIS 304; 3 T.C.M. (CCH) 289; T.C.M. (RIA) 44099; March 31, 1944
*304 1. A reasonable allowance for depreciation of a boat is determined from the evidence. 2. In a year prior to the taxable year petitioner caused certificates of "Guaranteed Prior Preference Stock" to be issued in place of certain demand notes held by its principal stockholder. The certificates carried no fixed maturity date but provided that the holder "shall be entitled to interest at the rate of seven per cent (7%) per annum, fully guaranteed and payable monthly whether earned or not" and that "This instrument shall enjoy all priority as to voting privileges and distribution of assets." Held, the certificates so issued did not constitute certificates of indebtedness and that the so-called interest paid thereon was not therefore deductible under section 23(b) of the Internal Revenue Code. Ben Blum, Esq., for the petitioner. Samuel G. Winstead, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding involves the determination by the respondent of a deficiency in income tax for the taxable year ended July 31, 1940, in the amount of $330.04. The deficiency is due to three adjustments which the respondent made to the net income as reported by *305 petitioner on its return. The first adjustment is not contested. The remaining two adjustments are explained by the respondent as follows: (b) The deduction from income in the amount of $700 claimed in your return to represent depreciation on a boat has been adjusted to the amount of $200 since it has been determined that the latter-stated amount represents a reasonable allowance. (c) The deduction from income in the amount of $1,757.50 claimed in your return as interest on preferred stock is disallowed since the amount stated was not paid or accrued on indebtedness. By appropriate assignments of error petitioner contests the two adjustments above explained. Findings of Fact During the taxable year ended July 31, 1940, petitioner was a corporation chartered under the laws of the State of Texas with its principal office located in the City of Houston. It was dissolved on or about December 20, 1941. For the taxable year in question it filed its corporation income and excess-profits tax return with the Collector for the First District of Texas in the City of Austin. The net income reported by petitioner on its return was adjusted by the respondent as follows: Net income as disclosed by return
$13,595.03
Unallowable deductions and additional
income
(a) Donation
$ 100.00
(b) Depreciation
500.00
(c) Interest
1,757.50
2,357.50
Net income adjusted
$15,952.53
*306 Facts as to adjustment (b). During September 1939 petitioner purchased a boat for $2,500 designated on the official record as the "YELPUR" which had been constructed at Biloxi, Mississippi, about 1932. At the time of the purchase the boat was about seven years old. Petitioner used the boat in its business until petitioner was dissolved at which time the boat was transferred to a partnership at its then depreciated book value of approximately $500. The partnership continued to use the boat until May 30, 1942, at which time restrictions imposed by the Navy and the United States Coast Guard rendered it impractical to use it. On or about March 1, 1943, a bareboat charter was made and entered into between the United States of America as "Charterer" and the partnership as "Owner" which contract provided in part as follows: "WITNESSETH, the Charterer agrees to hire and the Owner agrees to let the 'Yelpur' (hereinafter called the 'Vessel') in accordance with the terms and conditions hereinafter set forth: "Article 1. VESSEL CHARTERED. - The descriptive characteristics of the Vessel are: Name Yelpur type Small Boat length overall registered 35 ft. 6 in., beam 11 ft., 5 inches *307 draft 3 feet engine Kermath 4-cycle gross tonnage official number 220771 "Article 2. CHARTER PERIOD. - This charter, unless sooner terminated as provided in Article 13 hereof, shall run from the time of delivery of the Vessel to and including a date six months after the date which the President declares as the end of the national emergency. "Article 3. CHARTER HIRE. - The charterer shall pay hire to the Owner in the amount of one dollar ($1.00) for the charter period, payment to be made at the termination of such period. "Article 4. DELIVERY AND REDELIVERY. - The Charterer shall accept delivery of the Vessel * * * and, unless the Vessel is lost, the Owner shall upon the termination of this charter take redelivery of the Vessel * * * Provided, however, that upon notice to the Charterer by the Owner that the Owner does not desire to take redelivery of the Vessel, the Charterer shall have the right to purchase the same for the sum of one dollar ($1.00), and in the event the Charterer exercises such right, the Owner will convey title to the Vessel to the Charterer by appropriate bill of sale. * * * * *
"Article 13. TERMINATION. - (a) If, at any time during *308 the charter period, the Charterer shall determine that the use of the Vessel is no longer necessary or desirable, this charter may be terminated by the Charterer upon giving to the Owner not less than Thirty (30) days' prior written notice of such termination, and redelivery shall be made in accordance with the provisions of Article 4 hereof." On April 19, 1943, the Port Director at Galveston wrote W. J. Eaton, one of the partners of the partnership, as follows: "The boat YELPUR which you so generously loaned to this activity is no longer of any use to the Navy. The difficulties of maintaining it in running condition has necessitated our discontinuance of its use. * * * * *
"This activity has been informed that a sale of the YELPUR for $100.00 can be consummated. It is possible that you would prefer reclaiming the boat and making disposition yourself. "It is requested that you inform this activity of what disposition you wish us to make of the boat. We wish to again thank you for the use of the YELPUR and for your cooperation." Eaton in reply to the above-mentioned letter dated April 19, 1943, informed the Port Director that the partnership had written the boat off as a depreciated *309 asset; that it placed no value on the boat; and suggested that the Port Director sell the boat for what it would bring and donate the proceeds to Navy Relief. On its return for the taxable year in question petitioner deducted $700 (28 percent of cost) as representing depreciation sustained on the boat YELPUR during the taxable year. The respondent determined that $200 (8 percent of cost) represented a reasonable allowance for depreciation on the boat and added the difference of $500 to petitioner's taxable net income. Upon the foregoing evidentiary facts we find as an ultimate fact that a reasonable allowance for depreciation on the boat from September 1939 to July 31, 1940, was $550. Facts as to adjustment (c). Petitioner was chartered under the laws of the State of Texas on August 5, 1936, with a capital stock consisting of 250 shares of common stock of the par value of $100 per share. This stock was originally owned except for one qualifying share as follows: W. J. Eaton (husband)
25%
Ann Gene Eaton (wife)
25%
Jack W. Trimble
50%
During October 1938 W. J. Eaton acquired all of Trimble's holdings by cancellation of a demand note for $12,300 secured by the stock *310 which Eaton held. Eaton assumed the active management of the business of petitioner on or about January 1, 1938. At that time Eaton considered petitioner as being insolvent as a result of an embezzlement by the bookkeeper and an operation loss. Eaton loaned petitioner sufficient funds to pay off all the creditors except himself so that on and after January 1, 1939, Eaton was petitioner's sole creditor. On March 1, 1939, petitioner was indebted to Eaton in the amount of $43,000 which indebtedness was represented partly by demand notes and partly by short term notes. On or about March 1, 1939, petitioner attempted to rent a vacant lot at Louisiana and McKinney Streets in the northwest corner from what was known as the Graves Estate, because of the fact that petitioner's lease at its then present location expired on August 1, 1939. The Graves Estate refused to lease the lot to petitioner for the reason that petitioner's indebtedness to Eaton in the form of demand and short term notes was $43,000 which was considerably in excess of petitioner's capitalization of, $25,000 represented by the common stock. Petitioner, through Eaton, then contacted a tax consultant and as a result thereof *311 the stockholders of petitioner held a meeting. At this meeting it was determined that it was advisable, because of the credit standing of petitioner, to issue 250 shares of guaranteed prior preference stock of the par value of $100 per share in place of $25,000 face value of petitioner's notes payable on demand which were held by Eaton. Thereafter 250 shares of such stock were issued to Eaton and the "Capital Notes Payable" account in petitioner's ledger was debited with the amount of $25,000. The 250 shares were issued for the purpose of showing a better balance sheet. The following is a specimen certificate of the stock thus issued: INCORPORATED UNDER THE LAWS OF THE STATE OF TEXAS
Houston, Texas
NUMBER 11 SHARES TEXAS DRIVURSELF SYSTEM, INCORPORATED Guaranteed Prior Preference Stock $100.00 Par Value 7% Per Annum THIS CERTIFIES THAT is the owner of shares of the Prior Preference Stock of the Texas Drivurself System, Incorporated, fully paid and nonassessable, which stock shall be entitled to interest at the rate of seven per cent (7%) per annum, fully guaranteed and payable monthly whether earned or not. This instrument shall enjoy all priority as to voting *312 privileges and distribution of assets. IN WITNESS WHEREOF, the said Texas Drivurself System, Incorporated, has caused this certificate to be signed by its duly authorized officers and to be sealed with the Seal of the corporation this day of 194 .
SECRETARY PRESIDENT On July 15, 1939, the entire board of directors of petitioner met and passed the following resolution: "BE IT RESOLVED that Interest of 7% Per Annum on the $25,000.00 preferred stock of this corporation is hereby voted. The said Interest shall be payable at the end of each month." During the taxable year in question petitioner, in accordance with the above-mentioned resolution, paid Eaton the amount of $1,757.50. Petitioner deducted this amount on its income tax return as "Interest Pd. Pref. Stock." In the capital stock tax return filed by petitioner for the year ending June 30, 1940, the preferred stock was listed as capital stock. The preferred stock was carried on petitioner's balance sheets as of the beginning and end of the taxable year as capital stock and not as an indebtedness. At the time petitioner was dissolved in December 1941, Eaton was petitioner's sole creditor. Petitioner's balance *313 sheets as of the beginning and end of the taxable year as reported on its income tax return are as follows: Beginning
End of
of Taxable
Taxable
Year
Year
ASSETS: Cash
$ 738.39
$ 5,652.41
Notes and Accounts Re-
ceivable
10,529.33
13,095.90
Capital assets (less de-
preciation)
58,467.76
58,597.28
Prepaid rent
1,230.00
1,230.00
Totals
$70,965.48
$78,575.59
LIABILITIES & CAPITAL: Notes Payable
$21,963.43
$14,000.00
Surplus reserves
688.63
5,469.89
Preferred capital stock
25,000.00
25,000.00
Common capital stock
25,000.00
25,000.00
Earned Surplus & Undi-
vided Profits
(1,686.58)
9,105.70
Totals
$70,965.48
$78,575.59
As an ultimate fact we find that the guaranteed prior preference stock did not constitute "indebtedness" as that term is used in section 23 (b) of the Internal Revenue Code. Opinion BLACK, Judge: The questions at issue are whether the respondent erred (1) in disallowing $500 of the $700 depreciation claimed by petitioner on a boat and (2) in disallowing a deduction for alleged interest paid in the amount of $1,757.50. Regarding the question of depreciation the applicable statute is section 23(1) of the Internal Revenue Code. *314 [1] The question of what constitutes a "reasonable allowance" for depreciation is a question of fact. Petitioner contends that it has sustained its burden of proving that it was entitled to the full $700 of depreciation for the boat YELPUR which it deducted on its income tax return. The respondent contends that the record does not contain sufficient information to redetermine accurately the allowable depreciation on the boat. He points out in his brief that the evidence relates to certain transactions involving the boat, which tend to show that petitioner may ultimately sustain a "loss" on the boat; that it is impossible to determine with any accuracy how much depreciation should be allowed on the boat for the taxable year; and that in order to make an accurate determination it would appear essential to know what condition the boat was in when acquired by petitioner, its probable life at *315 that date, and a more detailed description of the boat. There is considerable merit in the respondent's contentions and yet we believe the evidence is sufficient to sustain a greater allowance than was determined by the respondent although we do not think it is sufficient to fully justify the deduction claimed by petitioner. The boat was a small boat and was seven years old when petitioner acquired it in September 1939, at a cost of $2,500. Petitioner used the boat until petitioner was dissolved in December 1941 at which time it was transferred to a partnership. The partnership used it until May 30, 1942, at which time it became impractical to use it on account of certain restrictions imposed by Federal authorities. Then on or about March 1, 1943, the partnership chartered the vessel to the United States for the duration at a nominal charter hire of $1.00 for the period, but on April 19, 1943, the charterer notified the owner of the vessel that due to the difficulties of maintaining the vessel in running condition it was necessary for the charterer to discontinue its use. The partnership through one of the partners then notified the charterer to the effect that the partnership considered *316 the boat completely depreciated and of no value and suggested that the boat be sold and that the proceeds be turned over to the Navy Relief. The Port Director at Galveston thought the vessel could be sold for $100. In view of these facts we think it may reasonably be inferred that at the time petitioner acquired the vessel in September 1939 it had a remaining useful life of approximately 43 months with a salvage value of approximately $100. We think that $550 constitutes a reasonable allowance for depreciation of the boat for the taxable year in question and have so found as an ultimate fact. The second issue is whether the amount of $1,757.50 paid by petitioner during the taxable year on its guaranteed prior preference stock represented interest paid on "indebtedness" as that term is used in section 23(b) of the Internal Revenue Code. This provision of the Code and the applicable regulations thereunder are printed in the margin. [2] The leading cases are collected and analyzed in Mertens, Law of Federal Income Taxation, Vol. 4, section 26.10. The Seventh Circuit recently in Commissioner v. Meridian & Thirteenth Realty Co., 132 Fed. (2d) 182, enumerated *317 the criteria named to aid in determination as follows: Fixed maturity; payment of dividends out of earnings only; cumulative dividends; participation in management; whether unpaid dividends bear interest; right to sue in case of default, and whether status is equal to, or inferior to that of regular corporate creditors; nomenclature used in the documents; intent of the parties. In the instant proceedings the certificates in question had no fixed maturity. That was the situation in United States v. South Georgia Ry. Co., 107 Fed. (2d) 3, *318 with respect to which the Fifth Circuit said: * * * There is, thus, an entire absence here of the most significant, if not the essential feature of a debtor and creditor as opposed to a stockholder relationship, the existence of a fixed maturity for the principal sum with the right to force payment of the sum as a debt in the event of default. Jewel Tea Co. v. United States, 2 Cir., 90 Fed. (2d) 451, 112 A.L.R. 182; Commissioner of Internal Revenue v. O.P.P. Holding Corporation, 2 Cir., 76 Fed. (2d) 11; Jefferson Banking Co. v. Trustees of Martin Institute, 146 Ga. 383, 91 S.E. 463; Commissioner of Internal Revenue v. Proctor Shop, Inc., 9 Cir., 82 Fed. (2d) 792. It therefore appears plain, we think, upon the face of the certificates that the holders are along with the common stockholders, owners of the company, with certain preferences and rights as between them and the common stockholders, not at all unusual in such certificates, and in no manner inconsistent with their relation as preferred stockholders. Further, we think *319 it clear, that if resort be had to the circumstances surrounding the issuance of the certificates, and their handling and treatment since their issue, it will even more plainly appear that they were intended to be and are evidences not of debt but of company ownership. The certificates in question in the instant case certify that the holder is the "owner" of shares of stock. They do not contain any promise to pay the principal or par value thereof except that the holder thereof is to enjoy all priority as to voting privileges and distribution of assets. Although the certificates in question had no fixed maturity they did provide that the said "stock shall be entitled to interest at the rate of seven per cent (7%) per annum, fully guaranteed and payable monthly whether earned or not." This is the most important criterion from petitioner's viewpoint. Cf. Helvering v. Richmond, F. & P.R. Co., 90 Fed. (2d) 971. In United States v. South Georgia Ry. Co., supra, the preferred stock certificates involved, carried, among other provisions, the following provision with reference to the payment of so-called "interest": *320 "Said preferred stock shall be cumulative and shall bear interest at the rate of seven per cent per annum, payable on the 1st day of January and the 1st day of July of each year." Notwithstanding the above quoted provision with reference to the payment of "interest" the Court held, as we have already stated, that the preferred stock in that case did not represent indebtedness of the company and that the so-called "interest" payments were not interest but represented distribution of dividends to preferred stockholders and were not deductible in determining the Railway Company's net income. We do not think the facts in the instant case are any stronger for petitioner than they were for the taxpayer in the South Georgia Ry. Co. case. In determining such a question as we have here to decide, all the criteria and circumstances must be weighed. United States v. South Georgia Ry. Co., supra;Commissioner v. J. N. Bray Co., 126 Fed. (2d) 612; Parisian, Inc. v. Commissioner, 131 Fed. (2d) 394; Commissioner v. Meridian & Thirteenth Realty Co., supra. In Helvering v. Richmond F. & P.R. Co., supra, *321 there was a mortgage which guaranteed both the so-called stock and the so-called dividends. The certificates in the instant proceedings do not indicate in what manner the payment of the so-called interest was guaranteed and the evidence aliunde is likewise silent as to this criterion. The mere provision in the certificate for the payment of so-called interest "whether earned or not" is not necessarily inconsistent with "distributions" by corporations under section 115, I.R.C. for it is recognized under subsection (d) of section 115 that in some instances there may be a distribution from capital. Cf. Pacific Southwest Realty Co. v. Commissioner, 128 Fed. (2d) 815. Upon cross examination Eaton was asked what he considered he had accomplished by exchanging his notes for the certificates in question and he answered: I considered that over a period of time the corporation would be able to repay me, first, the remaining capital notes of about $18,000.00 and eventually, out of its earnings since I had gotten it back on a proper basis, to be able to retire the preferred stock and there would be nothing but common stock. In John Wanamaker Philadelphia v. Commissioner, 139 Fed. (2d) 644, *322 the taxpayer corporation, as in the instant proceeding, likewise issued what it called preferred stock to its principal stockholder in exchange for certain indebtedness owed by the corporation to the stockholder. Among other provisions the certificate there involved provided "(a) Said preferred capital stock shall receive annual dividends of six (6) per cent, and not more, to be declared by the Board of Directors * * *. (b) Said preferred capital stock shall have no voting power" and (d) After six months from the demise of John Wanamaker the within stock shall begin to bear interest, and, after one year from date thereof, the first dividend shall be declared thereon. On one year's written notice, after date of the first dividend, the Corporation shall purchase at One Hundred and Ten ( $110) Dollars a share, all, or such part, of said preferred stock, not less than Fifty Thousand ($50,000) Dollars per annum, as it shall elect, and shall continue such purchases at the end of each fiscal year of the business of John Wanamaker Philadelphia, under said terms and conditions, until the entire issue of ten thousand (10,000) shares shall have been bought, at which time said preferred capital *323 stock shall be delivered to John Wanamaker Philadelphia. It was held in that case, contrary to the contentions of the taxpayer, that the latter had failed to establish that a creditor-debtor relationship existed. We do not think the proof offered in the instant proceedings in support of such a relationship is any stronger, if as strong, as it was in the Wanamaker case. Considering the remaining criteria enumerated by the Seventh Circuit, supra, the so-called interest may be said to be "cumulative" since it was payable monthly whether earned or not. There was participation in management since the certificate holder was to "enjoy all priority as to voting privileges." This criterion is not usually found in certificates of indebtedness. If any of the so-called monthly interest remained unpaid there was no provision for interest on such unpaid amounts. Neither did the certificates provide for any right to sue in case of default. Since Eaton, the owner of all the certificates in question, held himself out to the public as the "owner" of shares of stock of the petitioner, he could hardly claim that as to such certificates he had a status equal to that of a regular corporate *324 creditor. See John Wanamaker Philadelphia v. Commissioner, supra;Verifine Dairy Products Corporation of Sheboygan, Inc., 3 T.C. 269. The nomenclature used is not that of a certificate of indebtedness. We come now to the "intent of the parties" which the Seventh Circuit in Commissioner v. Meridian & Thirteenth Realty Co., supra, said was "of extreme importance." At the time the certificates in question were issued Eaton and his wife were the sole stockholders except for one qualifying share. The petitioner owed Eaton $43,000. The greater part of this indebtedness (about $35,000) was represented by demand notes. Because of this condition petitioner was refused a lease on a vacant lot which it desired for its business. The objection which the owner of the property which petitioner desired to lease was that petitioner's balance sheet showed an excessive amount of indebtedness represented by demand notes in comparison with its capital stock. Petitioner then sought to correct this condition by issuing the certificates in question in place of demand notes in the amount of $25,000. In making this change, *325 there is some evidence in the record that petitioner took cognizance of such cases as Helvering v. Richmond, F. & P.R. Co., supra, and similar cases, thereby hoping to improve the looks of its balance sheet and at the same time have the certificates in such form as to claim for tax purposes that they evidenced a creditor-debtor relationship. We do not believe that in this petitioner succeeded. Petitioner relies heavily upon United States v. Title Guarantee & Trust Co., 133 Fed. (2d) 990. The so-called preferred stock certificates involved in that case contained the following provisions which the Sixth Circuit said were "Perhaps the most important of the provisions": * * * If any preferred shares shall be outstanding on July 1, 1949, the corporation shall and does hereby agree to redeem the same at their par value plus accrued dividends on the next succeeding dividend payment date and on such date the holders thereof, upon presentation and surrender of the certificates, shall be entitled to be paid the par value of such shares plus accrued dividends thereon. In holding that the appellee in that case had successfully *326 proven that the so-called preferred stock there involved was in substance certificates of indebtedness the Court, among other things, said: A fixed maturity date has been held to be the most significant feature of the debtor-creditor relation. We do not have a fixed maturity date in the instant proceedings, and we think that this circumstance sufficiently distinguishes the instant proceedings from United States v. Title Guarantee & & Trust Co., supra. After a careful consideration of all the circumstances surrounding the issuance of the certificates together with the provisions thereof and the lack of any fixed maturity date we are of the opinion that petitioner has not met its burden of proving that the payment of the $1,757.50 upon the guaranteed prior preference stock was in reality interest upon indebtedness. We, therefore, sustain the respondent upon this issue. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. * * *↩
2. Internal Revenue Code. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(b) Interest. - All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from taxes imposed by this chapter. Regulations 103. Sec. 19.23 (b)-1. Interest. - * * * * *
* * * So-called interest on preferred stock, which is in reality a dividend thereon, cannot be deducted in computing net income. * * *↩